UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEBCORE-OBAYASHI JOINT VENTURE,<br><br>            Plaintiff,<br><br>      v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>            Defendant. | Case No. 19-cv-07799-SI<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 24 |

On July 24, 2020, this Court heard oral argument on plaintiff Webcore-Obayashi Joint Venture's motion for partial summary judgment. Having carefully considered the arguments of the parties and the papers submitted, plaintiff's motion for partial summary judgment is GRANTED IN PART.

**BACKGROUND**

In March 2009, Webcore-Obayashi Joint Venture ("WOJV") and the Transbay Joint Power Authority ("TJPA") entered into a contract for WOJV to be the general contractor responsible for constructing the Salesforce Transit Center (the "Center") in San Francisco, California. Gillespie Decl. ¶ 6. Under the contract, WOJV was prohibited from doing any of the actual construction, so it relied on several subcontractors; one of whom was responsible for the fabrication of the building's steel girders. *Id.* ¶¶ 6-7.

WOJV also entered into a contract with Zurich American Insurance Company ("Zurich") for

Builder's Risk Insurance.[1]  Stoelting Decl. ¶¶ 5-6.  The policy was in effect from March 28, 2011 to July 16, 2018.  *Id.* at Ex. A.  WOJV paid Zurich more than $12 million in premiums for a total protection amount of over $1.5 billion.  *Id.* ¶ 7.  The general policy provisions are as follows: "This policy, subject to the terms, exclusions, limitations and conditions contained herein or endorsed hereto, insures against all risks of direct physical loss of or damage to Covered Property while at the location of the INSURED PROJECT*[2] and occurring during the Policy Term."  Stoelting Decl., Ex. A at form PBR 001-COV (9-07A), page 1 of 13.  Some of the policy's exclusions under the "Cost of Making Good" section include "faulty or defective workmanship, supplies or material."  *Id.* at page 2 of 13.

In September 2015, girders were installed on the Fremont Street side of the Center ("Fremont Street Girders").  Gillespie Decl. ¶ 9.  Construction of the Center was substantially completed on July 12, 2018, and it was opened to the public in August 2018.  *Id.* ¶ 11.

On September 25 and 26, 2018, workers discovered two fractures in two separate Fremont Street Girders.  *Id.* ¶¶ 13-16.  The Transit Center was immediately closed.  *Id.* ¶ 14.  These fractures were found by painters working in a part of the Center above a ceiling, which separated that part of the Center from the pedestrian and public access area.  Kent Decl. ¶ 3.  On September 27, 2018, WOJV filed a claim with Zurich to recover the costs of investigating the damage, installing the shoring, and permanently repairing the property.  Stoelting Decl., Ex. B, C.  WOJV worked with TJPA to investigate, shore, and make repairs, ultimately spending millions of dollars on this process.[3]  Gillespie Decl. ¶¶ 15, 17.  The Center was reopened to the public in 2019.  *Id.* ¶ 19.

TJPA hired LPI, Inc. to determine the cause of the fractures.  *Id.* ¶ 4.  On November 12,

---

[1] Builder's Risk Insurance "is a unique form of property insurance that typically covers only projects under construction, renovation, or repair and insures against accidental losses, damages or destruction of property for which the insured has an insurable interest . . . . The purpose of builder's risk insurance is to compensate for loss due to physical damage or destruction caused to the construction project itself."  *Factory Mutual Ins. Co. v. Peri Formworks Systems, Inc.*, 223 F. Supp. 3d 1133, 1143 (D. Or. 2016) (quoting *One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 WL 2226202 at *3 (N.D. Ill. Apr. 22, 2015)) (internal quotation marks omitted).

[2] The "Insured Project*" is the Salesforce Transit Center.  Stoelting Decl., Ex. A.

[3] The total amount spent was $4,866,543.63.  Stoelting Decl., Ex. C at 3

2019, LPI issued its final report. Saraf Decl., Ex. B. at 135 ("LPI Report"). It stated that after the girders were thermally cut to create weld access holes in September 2015, microcracks gradually started to develop. *Id.* at 184-95; Kent Decl. ¶ 11. Subsequently, when the girders were installed, larger "pop-in cracks" developed at the access holes from residual stress. *Id.* Due to these "pop-in cracks," fractures formed in the girders because of the stress from the thermally cut weld access holes and the normal service induced stress. *Id.* LPI concluded these fractures necessarily occurred between February and April 2018. LPI Report at 134. LPI also concluded the fractures were not formed due to structural design issues, asserting the service induced stress alone would not have caused the fractures had no weld access holes been created. *Id.* at 185. WOJV hired Exponent, Inc., to determine the nature of the fractures and when they occurred. Saraf Decl. ¶¶ 2-3. Exponent concluded these fractures were "brittle"—meaning they occurred quickly and without warning. *Id.* ¶ 3. Exponent also concluded the fractures occurred no later than June 2018. *Id.*

Zurich hired Kent Engineering ("Kent") to conduct its own girder failure analysis. Kent Decl., ¶ 2. On March 28, 2019, Kent issued its report. Stoelting Decl., Ex. D ("Kent Report"). It agreed with LPI's conclusions and found "3 distinct stages in crack propagation" that occurred from September 2015 to mid-2018. *Id.* at 2; Kent Decl. ¶¶ 8, 11. These stages were: (1) "microcrack formation at the inner surface of [the weld access holes]," (2) "semi-elliptical pop-in crack extension from the tip of existing microcracks," and (3) "final girder fracture." Kent Report at 3. Kent determined mechanical grinding should have been performed to remove the layer of microcracks and prevent the final fractures from occurring. *Id.* Ultimately, Kent concluded "that the Fremont Street fractures were the result of brittle micro-cracks that eventually grew through the entire girder flange over approximately 30 months." Kent. Decl. ¶ 8.

On April 24, 2019, Zurich denied coverage on the basis that the damage did not manifest until after the policy term's expiration. Stoelting Decl., Ex. C. at 60 (Coverage Denial Letter). It also stated that since the fractures were due to faulty or defective materials workmanship, coverage was precluded under the policy's exclusions. *Id.*

On June 6, 2020, WOJV filed the instant motion for partial summary judgment. WOJV requests an order from the Court that (1) as a matter of law, *Prudential-LMI Coms. Ins. v. Superior*

3

1  *Court,* 51 Cal. 3d 674 (1990), is limited to insurance claims for progressive loss; (2) as a matter of
2  fact, the fractures in the steel girders occurred suddenly and were not progressive; (3) as a matter of
3  fact, the fractures occurred no later than June 2018, while WOJV was still covered by Zurich's
4  insurance policy; and (4) as a matter of fact, the fractured girders fall within Zurich's builder's risk
5  policy.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.' " *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex*, 477 U.S. at 324). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to

4

1    raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*,
2    594 F.2d 730, 738 (9th Cir.1979). The evidence the parties present must be admissible. Fed. R.
3    Civ. P. 56(c)(2).

**DISCUSSION**

WOJV contends that the "manifestation of loss" rule established in *Prudential-LMI Commercial Insurance v. Superior Court.*, 51 Cal. 3d 674 (1990), is limited to cases where progressive damage has occurred over multiple policy periods implicating multiple insurers. Dkt. No. 15 at 6 (Reply). Zurich argues that *Prudential-LMI*'s manifestation rule applies to all first party property claims, including claims for sudden damage, and that it is not limited to situations involving multiple policy periods and successive insurers. Dkt. No 13 at 6-9 (Opp'n).

WOJV's interpretation of *Prudential-LMI*'s holding is accurate. In *Prudential-LMI*, an insured discovered progressive property damage in the foundation and floor of its apartment building. *Prudential-LMI*, 51 Cal. 3d at 680-81. The damage occurred over multiple policy periods, and the insured sued all five insurers (one of which was Prudential-LMI) who provided coverage while the damage progressed, claiming all were liable. *Id.* The California Supreme Court addressed three distinct issues:

> (i) when does the standard one-year limitation period . . . contained in all fire policies (pursuant to Ins. Code, § 2071) begin to run in a progressive property damage case;
>
> (ii) should a rule of equitable tolling be imposed to postpone the running of the one-year suit provision from the date notice of loss is given to the insurer until formal denial of the claim; and,
>
> (iii) when there are successive insurers, who is responsible for indemnifying the insured for a covered loss when the loss is not discovered until several years after it commences?

*Id.* at 678.

Regarding the statute of limitations, the Court held "that the one-year suit provision begins to run on the date of inception of the loss, defined as that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered." *Id.* On the second question of equitable

5

tolling, the Court held "that this limitation period should be equitably tolled from the time the insured files a timely notice, pursuant to policy notice provisions, to the time the insurer formally denies the claim in writing." *Id.*

As for the allocation of indemnity, the Court concluded "that in a first party property damage case (i.e., one involving no third party liability claims), the carrier insuring the property at the time of manifestation of property damage is solely responsible for indemnification once coverage is found to exist." *Id.* at 678-79. The Court held that the insurer providing coverage when progressive loss first manifests "is liable for the entire loss" and "must pay the entire claim." *Id.* at 696, 698. The Court emphasized that its holding was "limited in application to the first party *progressive* property loss cases in the context of a homeowner's insurance policy." *Id.* at 679 (emphasis added).

The Court also explained that the definition of "inception of loss," as used in the delayed discovery context, and "manifestation of loss," as used in the progressive loss context, is the same: "that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered." *Id.* at 699. As the Court's opinion makes clear, even though the definition of both rules is the same, the purpose of the inception of loss rule is to clarify when the statute of limitations period starts to run for section 2071 claims, and the purpose of the manifestation of loss rule is to clarify which insurer is liable in cases of progressive loss. While the Court limited the application of the manifestation rule to claims dealing with progressive loss, it made no such limitation for the inception of loss rule.

The cases WOJV cites affirm that the manifestation rule applies to situations where progressive loss occurs over multiple policy periods. *See e.g.*, *In Central Nat. Ins. Co. v. Super. Ct.*, 2 Cal. App. 4th 926, 933-34 (1992) (stating that *Prudential-LMI* "examined the allocation of indemnity among successive first party insurers when a loss is continuous and progressive"); *Sapiro v. Encompass Ins.*, 221 F.R.D. 513, 518 (N.D. Cal. 2004) (citing *Prudential-LMI* and holding, "[u]nder this 'manifestation rule,' liability in 'first party progressive property loss cases' falls completely on the insurer of the property at the time the loss 'manifests' . . . .); *see also* Justice H. Walter Croskey *et al.*, Cal. Practice Guide: Insurance Litigation, Ch. 6B-B, §§ 6:231-232 (Rutter

Group 2019) ("Trigger of coverage issues arise where progressive property damage (or progressively deteriorating damage) occurs over an extended period of time, during which several successive insurance policies were in effect. . . [I]n such circumstances: . . . [t]he insurer insuring the risk at the time a progressive loss is 'manifested' is *solely responsible* for the loss, including damages suffered after expiration of its policy period[,]" citing *Prudential-LMI*, 51 Cal. at 699) (emphasis in original)).

The cases upon which Zurich relies address *Prudential-LMI*'s holding regarding the inception of loss rule to determine when the statute of limitations starts to run for section 2071 claims, and not the holding about manifestation of loss. *See*, *e.g.*, *Kapsimallis v. Allstate Ins. Co.*, 104 Cal. App. 4th 667, 673 (2002) ("The [*Prudential-LMI*] court's opinion makes plain its definition of 'inception of the loss' is based on the standard form language in section 2071 . . . . The delayed discovery rule of *Prudential–LMI*, therefore, applies regardless of the nature or severity of the physical event causing the loss."); *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1094 (9th Cir. 2003) (holding homeowners' claims were time-barred and citing *Prudential-LMI* for proposition that "[t]he inception of loss occurs when the insured should have known that appreciable damage had occurred, not when the homeowner learned the true extent of the damage."); *Hill v. Allstate*, 962 F. Supp. 1244, 1246-47 (C.D. Cal. 1997) (citing *Prudential-LMI* and stating, "[i]n that case, the court directly addressed the issue of when a one-year limitation in an insurance policy begins to run."); *Seneca Insurance Company, Inc. v. AMCO Insurance Company*, Case No. SACV 14-01788-CJC (DFMx), 2015 WL 8915332, at *5 (C.D. Cal., Dec. 7, 2015) (similar). As stated above, while the definition of "inception of loss" and "manifestation of loss" is identical, these rules are meant to be applied in different contexts—the former in cases involving *either* sudden or progressive loss, the latter *only* in cases involving progressive loss. While Zurich attempts to use language from these cases to argue that the manifestation rule has been extended to claims for non-progressive loss, a review of the cases proves otherwise.[4]

---

[4] Zurich also cites two other cases, which explicitly involve progressive loss over multiple policy periods. *See Stanton Road Assocs. v. Pacific Employers Ins. Co.*, 36 Cal. App. 4th 333, 339 (1995) ("[In *Prudential-LMI*], the Supreme Court adopted the 'manifestation rule' for allocating indemnity between successive first-party property insurers for progressive losses spanning multiple

7

Relying on *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 654 (1995), Zurich also contends that *Prudential-LMI* is not limited to progressive loss cases and that the manifestation rule was solely intended to distinguish first and third party liability cases. This is incorrect. The *Montrose* court explained that *Prudential-LMI* "expressly reserved the question of what rules should apply in third party liability insurance cases involving *continuous or progressively deteriorating damage or injury*." *Montrose*, 10 Cal. 4th at 654 (emphasis added). Accordingly, in *Montrose*, a third party liability case, the Court sought to resolve that very question. After considering various approaches to dealing with progressive loss over successive policy periods in third party liability cases—including the manifestation rule—the Court decided "the continuous injury trigger of coverage [theory] should be adopted." *Id.* at 685. Under this theory, "bodily injury and property damage that is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." *Id.* at 675.

While the *Montrose* court ultimately determined that different rules apply in first and third party liability cases dealing with progressive loss, the Court did not, as Zurich contends, hold that the purpose of *Prudential-LMI*'s manifestation of loss rule was to distinguish between first and third party liability cases. Rather, *Montrose* simply affirms that the manifestation rule is limited to first party liability progressive loss cases, and that the *Prudential-LMI* court left progressive loss issues in third party liability cases to be resolved in future decisions.

Zurich fails to point to any authority that applied *Prudential-LMI*'s manifestation of loss rule in a situation like the present one, where loss occurred over a single policy period but manifested after that policy expired, when no new policy was on the risk.[5] Accordingly, the Court finds

---

policy periods."); *Simon v. Allstate Indemnity Company*, No. C-95-1316 SI, 1996 WL 708587, at *4 (N.D. Cal. Nov. 26, 1996), (citing *Prudential-LMI* to reiterate that "under a first-party insurance policy, at least as to progressive damage caused by gradual events" the time of loss "is when the damage becomes 'manifest.'").

[5] WOJV explains that unlike in the homeownership and property context, contractors do not purchase successive insurance policies for damage to their construction projects; and builder's risk policies, like the one WOJV had with Zurich, "typically end with substantial completion of a project." Reply at 15 (citing F. Malcolm Cunningham, Jr. & Amy L. Fischer, *Insurance Coverage in Construction-the Unanswered Question*, 33 Tort & Ins. L.J. 1063, 1066 (1998)). Accordingly, once a construction project is substantially completed, the contractor no longer has an insurable interest, and thus it cannot purchase subsequent insurance. *See Fireman's Fund v. Structural*

8

*Prudential-LMI*'s manifestation rule is limited to cases involving progressive property loss that occurred over multiple policy periods.

Here, although the parties dispute whether the damage was the result of progressive deterioration or the result of sudden, discrete events, Zurich's opposition papers state that the damage began in September 2015 and had occurred by mid-2018, which would fall entirely within Zurich's policy period (March 28, 2011 to July 16, 2018). Stoelting Decl., Ex. A. *See* Kent Decl. ¶¶ 8, 11 ("[T]he fractures developed gradually starting in September 2015" and "eventually grew through the entire girder flange over approximately 30 months"). While the Court is not resolving at this time whether there is coverage under the policy based on other grounds, the Court concludes that Zurich cannot invoke *Prudential-LMI* to deny liability.[6]

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS WOJV's motion for partial summary judgment and holds that Zurich cannot rely on *Prudential-LMI* as a basis to deny coverage.

**IT IS SO ORDERED**.

Dated: August 3, 2020

SUSAN ILLSTON
United States District Judge

---

*Systems Tech., Inc.*, 426 F. Supp. 2d 1009, 1025 (D. Neb. 2006) ("A building contractor who contracts to construct a building has an insurable interest in the building during the course of construction…"); *American & Foreign Ins. Co. v. Allied Plumbing & Heating Co.*, 194 N.W.2d 158, 161 (Mich. Ct. App. 1971) (same).

[6] WOJV also seeks a ruling that there is coverage under the policy, while Zurich asserts that there is no liability based on a policy exclusion for the "Cost of Making Good." Zurich also suggests that the lawsuit may be time-barred based upon "when the Court determines the damage to the girders occurred as a matter of law." Opp'n at 13. The Court cannot resolve questions about the applicability of the exclusion on the current record, as both parties acknowledge. The Court finds that rather than address coverage and exclusion issues in a piecemeal fashion, the better course is to resolve all of those questions at the same time. As such, plaintiff can renew its coverage arguments in the anticipated cross-motions for summary judgment.