1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WEBCOR-OBAYASHI JOINT VENTURE,

          Plaintiff,

     v.

ZURICH AMERICAN INSURANCE
COMPANY,

          Defendant.

Case No.  19-cv-07799-SI

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

Re: Dkt. No. 138

On February 11, 2022, the Court held a hearing on defendant's motion for summary judgment.  For the reasons set forth below, the Court DENIES the motion.

**BACKGROUND**

In March 2009, Webcor-Obayashi Joint Venture ("Webcor") and the Transbay Joint Power Authority ("TJPA") entered into a contract for Webcor to be the general contractor responsible for constructing the Salesforce Transit Center (the "Transit Center") in San Francisco, California.  The Transit Center is a multi-level transit facility with retail shops, and it spans four city blocks, crossing over Fremont and First Streets. Two stories are underground and four stories are above ground, topped with a 5.4 acre rooftop park.   Under the contract, Webcor was prohibited from doing any of the actual construction, so it relied on several subcontractors, one of whom was responsible for the fabrication of the building's steel girders.

Webcor also entered into a contract with Zurich American Insurance Company ("Zurich")

for Builder's Risk Insurance.[1]   The policy was in effect from March 28, 2011, to July 16, 2018. Webcor paid Zurich more than $12 million in premiums for a total protection amount of over $1.5 billion. The insuring provision of the policy states: "This policy, subject to the terms, exclusions, limitations and conditions contained herein or endorsed hereto, insures against all risks of direct physical loss of or damage to Covered Property while at the location of the INSURED PROJECT* [the Salesforce Transit Center] and occurring during the Policy Term."   The policy also contains an exclusion for the "Cost of Making Good."[2]

Construction of the Transit Center was substantially completed on July 12, 2018, and it was opened to the public in August 2018.  On September 25 and 26, 2018, workers discovered fractures in two girders that cross over Fremont Street.  The Transit Center was immediately closed, and work began to investigate the cause of the fractures and to remediate them.[3]   That work involved, *inter alia*, shoring the structures over Fremont Street and First Street (which also contained girders); an investigation of the entire Transit Center, which required "unbuttoning" installed fixtures and systems[4]; installation of bolted steel sandwich plates at Fremont Street and First Street Bridge; "rebuttoning" of the Center; and a "health check" of the Center.   The Center was reopened to the

---

[1] Builder's Risk Insurance "is a unique form of property insurance that typically covers only projects under construction, renovation, or repair and insures against accidental losses, damages or destruction of property for which the insured has an insurable interest . . . . The purpose of builder's risk insurance is to compensate for loss due to physical damage or destruction caused to the construction project itself."  *Factory Mutual Ins. Co. v. Peri Formworks Systems, Inc.*, 223 F. Supp. 3d 1133, 1143 (D. Or. 2016) (quoting *One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11-C-2520, 2015 WL 2226202 at *3 (N.D. Ill. Apr. 22, 2015)) (internal quotation marks omitted).

[2] The Court previously held that the question of how this exclusion applies in this case requires a factual determination that cannot be made on this disputed record, and the Court noted, *inter alia*, that Zurich's own documents recognized that there was "difficulty" in applying this exclusion to claims and that "because such ambiguity exists there is, understandably, a preference to settle claims on a pragmatic basis in order to avoid the uncertainty of litigation."  *See* Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment at 4 n.2 (Dkt. NO. 65).

[3] The parties dispute what caused the fractures and whether the subsequent work that was done was undertaken to remediate the fractures or to address other issues.

[4] The declaration of Amanda Gillespie of Webcor describes the "unbuttoning" process.  *See* Gillespie Decl. ¶¶ 23-31 (Dkt. No. 147).  The Court OVERRULES Zurich's objections to the Gillespie declaration.

1   public in July 2019.

2       On September 27, 2018, Webcor filed a notice of loss with Zurich.  The parties dispute the

3   adequacy of Zurich's investigation of Webcor's claim.  On April 24, 2019, Zurich denied coverage

4   on the basis that the damage did not manifest until after the policy term's expiration.  Zurich's denial

5   letter also stated that because the fractures were due to faulty or defective materials workmanship,

6   coverage was precluded under the policy's Cost of Making Good Exclusion.

7       In two prior summary judgment orders, the Court has held that (1) Zurich cannot invoke the

8   "manifestation of loss" rule established in *Prudential-LMI Commercial Insurance v. Superior*

9   *Court.*, 51 Cal. 3d 674 (1990), to deny coverage because that rule is limited to cases where

10  progressive damage has occurred over multiple policy periods implicating multiple insurers; and (2)

11  Webcor has met its burden of establishing that the fractured girders fall within the insuring

12  agreement of the policy because the fractured girders constitute "physical" "damage" to "Covered

13  Property," and the burden thus shifts to Zurich to prove that the policy's Cost of Making Good

14  Exclusion clearly and unambiguously defeats coverage.[5]

15      Zurich now moves for summary judgment on the following types of Webcor's requests for

16  damages:  (1) damages that Zurich contends are excluded under the Cost of Making Good exclusion;

17  (2) damages that Zurich contends are unrelated to the repair of the Fremont Street fractures; (3)

18  liquidated damages; and (4) bad faith and punitive damages.

19

20  ─────────────────

    [5]  At the February 11, 2022 hearing, Zurich's counsel stated that Zurich was now taking the

21  position, for the first time in this litigation, that the fractures may have occurred sometime after the
    policy period ended when the Transit Center was opened to the public.  Webcor contends that the

22  Court already resolved this question when the Court ruled on the prior summary judgment motions.
    The Court notes that in connection with those earlier motions, Zurich opposed summary judgment

23  on various grounds but did not contend that the fractures occurred after the policy period ended.  To
    the contrary, Zurich submitted evidence showing that the fractures occurred sometime during the

24  policy period. *See, e.g.*, Kent Decl. ¶ 11 ("LPI and I have concluded that the fractures developed
    gradually starting in September 2015 following the thermal cutting of the girders the creation of

25  micro-cracks and, later, the development of pop-in cracks, and, finally, the resulting fracture of the
    girders approximately two and one half years following installation, in mid-2018.")  Dkt. No. 13-2.

26  Thus, the record before the Court when it ruled on the prior summary judgment motions was
    undisputed that the fractures occurred during the policy period.  If Zurich intends to assert at trial

27  that the fractures occurred after the policy period, Zurich would effectively be seeking
    reconsideration of the second summary judgment order which held that the fractured girders fell

28  within the insuring agreement of the policy.  If Zurich advances such a contention, the Court will
    address that matter in due course.

United States District Court
Northern District of California

United States District Court
Northern District of California

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 324). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Pub'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).[6]

---

[6] As discussed *infra*, the Court SUSTAINS Webcor's hearsay objection to the expert report of James Wraith. The Court does not rule on the balance of the parties' evidentiary objections as there is sufficient admissible evidence in the record to show the existence of various material factual disputes.

**DISCUSSION**

**I.      Cost of Making Good Exclusion**

Zurich asserts several different arguments in support of its position that Webcor cannot recover any of its costs for work performed on the Transit Center. Zurich argues that the evidence shows that the investigation determined that the Fremont Street and First Street bridges were defectively constructed and did not meet TJPA's safety requirements regarding being able to withstand a terrorist attack or partial structural failure. Zurich also asserts that based upon that determination, the decision was made not to return the Fremont Street girders to their pre-loss condition by filling in the fractures, but instead to rectify the construction defects by installing steel plates under and above the First Street and Fremont Street girders to improve their structural strength and meet TJPA's safety requirements. Thus, Zurich contends that "all of the costs for which Plaintiff is now seeking Policy benefits – shoring, unbuttoning the structure, investigation, reconstruction, and buttoning the structure back up – were necessary to remediate this defective construction." Zurich's Reply at 3 (Dkt. No. 154).

Zurich argues that all of these investigation and remediation costs are barred by the Cost of Making Good exclusion. That exclusion provides,

**4.  EXCLUSIONS**

This Policy does not insure against loss, damage or expense caused by, resulting from, contributed to or made worse by any of the following, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical loss or damaged insured by this Policy, except as specifically allowed below:

. . .

B.  Cost of Making Good

The costs that would have been incurred to rectify any of the following had such

rectification been effected immediately prior to the loss or damage:

(1) Fault, defect, error, deficiency or omission in design, plan or specification;

(2) Faulty or defective workmanship, supplies or material;

(3) Wear and tear, gradual deterioration, inherent vice, latent defect, corrosion, rust, dampness or dryness of the atmosphere.

However, if direct physical loss or damage by an insured peril ensues, then this Policy will cover for such ensuing loss or damage only.

For the purpose of this Policy and not merely this exclusion, Covered Property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under (1), (2) or (3) above.

Briggs Decl., Ex. U at ZA_PF 000930.  Zurich asserts that "[s]ince the policy excludes all costs that would have been incurred to rectify faulty or deficient construction 'had such rectification been effected immediately prior to' when the Fremont Street fractures occurred" all of Webcor's costs are excluded under the Policy's Cost of Making Good Exclusion.  *Id.*

The Court finds that Zurich has not met its burden to show that Webcor's claim is excluded because there are numerous factual disputes that preclude summary judgment on the application of the Cost of Making Good exclusion to this case.  The parties dispute, *inter alia*, whether construction or design defects caused the Fremont Street fractures; whether construction or design defects caused problems elsewhere in the Transit Center that needed to be fixed; and why certain repair options were or were not chosen.

Further, the Court notes that "exclusionary clauses are interpreted narrowly, whereas clauses identifying coverage are interpreted broadly."  *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 471 (2004).  "[T]he burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. . . [and] [t]he exclusionary clause 'must be conspicuous, plain and clear."  *Id.* (citations omitted).  "This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded."  *Id.*  Here, Zurich argues for an expansive application of the Cost of Making Good exclusion – an exclusion that the Court finds is hardly a model of clarity – to preclude all of Webcor's damages flowing from the fractured Fremont Street girders.  As discussed *infra*, the coverage portion of the policy contains broad language providing coverage for "all risks of direct, physical loss of or damage to Covered Property . . . ."  Under the circumstances of this case and on this record, Zurich has not demonstrated that it is entitled to a summary judgment ruling of no coverage based upon the Cost of Making Good exclusion.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.      Damages for Work Done Beyond Repairing Fremont Street Fractures

As a separate but related ground for summary judgment, Zurich argues that the majority of Webcor's claimed losses are costs that were not incurred for repairing the fractured Fremont Street girders, and that those losses are not covered under the Policy.  Zurich contends that many of Webcor's costs relate to work performed elsewhere at the Transit Center to improve the Center's structural strength and integrity, and those non-covered losses include, *inter alia*, costs to open and close 175 locations throughout the Transbay Transit Center so that welding and steel at those locations could be inspected, costs to remediate the First Street structure, and Webcor's "punch list" costs.

In support of that argument, Zurich relies on the "Valuation" provision of the Policy, which is found in "Section II – Policy Conditions."  That provision states, in part,

6. **VALUATION**

In the event of loss or damage by an insured peril and subject to the applicable Policy Limit, Sublimit or Annual Aggregate Limit of Liability as the case may be, the basis of adjustment of a claim at the time of loss, unless otherwise endorsed, shall be as follows:

A. PROPERTY UNDER CONSTRUCTION* (except Property of Others) – *The actual cost to repair or replace the lost or damaged property*, valued as of the time and place of loss, with material of like kind and qualify, less betterment, including contractor's profit and overhead, in the same percentage allocated in the original contract documents.  If not so replaced, loss shall be settled on an Actual Cash Value basis with proper deduction for depreciation and exclusive of profit and overhead.

. . .

Briggs Decl., Ex. U at ZA_PF000937 (Dkt. No. 146-1) (emphasis added).  Zurich argues that this provision means that the Policy only covers "the actual cost to repair or replace the lost or damaged property," which it defines solely as the fractured Fremont Street girders.

Webcor responds that the scope of coverage is determined by the plain language of the Policy's insuring agreement and declarations, not the "Valuation" provision.  Section I of the Policy, titled "Coverages and Exclusions," states "This Policy, subject to the terms, exclusions, limitations, and conditions contained herein or endorsed hereto, insures against all risks of direct physical loss of or damage to Covered Property while at the location of the INSURED PROJECT* and occurring

during the Policy Term." *Id.* at ZA_PF 000929.[7]  Webcor argues that this language – "all risks of direct physical loss of or damage to Covered Property" – broadly covers losses at the property that were related to the fractured girders, and that in all-risk policies such as Zurich's, the loss is presumed to be covered unless and until the insurer can prove it is specifically excluded.  Webcor also argues that Zurich's broad promise of all-risk coverage must be read in conjunction with the Policy's Declarations. In the section of the Declarations entitled "Limit of Liability," Zurich states that the "Policy Limit of Liability" is represented as not more than "$1,546,000,000 in any one OCCURRENCE*….."*Id.* at ZA_PF 000981.  "OCCURRENCE*" is defined to "include[] all losses or damages that are attributable directly or indirectly to one cause or a series of causes and includes all resultant or concomitant losses wherever located." *Id.* at ZA_PF 000940.

Webcor argues that the "Valuation" provision does not govern coverage, but instead describes how to value "the property lost or damaged," for example by setting the time at which property is to be valued.  Webcor contends that this is made clear by the rest of the sentence, which says that the loss is "valued at the time and place of the loss, with material of like kind and quality, less betterment, including contractor's profit and overhead."  Moreover, Webcor argues that even if the Valuation clause set forth or limited the scope of coverage, Zurich has not identified any support for its position that "repair" of "the property lost or damaged" is limited to the cost of manufacturing and installing steel sandwich plates on the Fremont Street girders, as opposed to any of the other "repairs" that Webcor asserts were necessary and related to the fractured girders.

The Court agrees with Webcor's interpretation of the policy.  "The 'insuring clause' (or 'insuring agreement') is the basic agreement by the insurance company to provide coverage to its insured."  Croskey, <u>California Practice Guide: Insurance Litigation</u> Ch. 3-C (2021).  Zurich does

---

[7] "Covered Property" is defined as "the Insured's interest in . . . [the] PROPERTY UNDER CONSTRUCTION*."  "PROPERTY UNDER CONSTRUCTION*" is defined in relevant part as "All property . . . for which the insured may have assumed responsibility, that will become a permanent part of the INSURED PROJECT* . . . , all when used . . . in . . . construction of the INSURED PROJECT*." *Id.* at ZA_PF 000940. The "INSURED PROJECT*" is defined as "work which the Insured is contractually obligated to perform in accordance with the contract documents being more fully described and located as set forth in the Declarations." *Id.* at ZA_PF 000939. The Declarations, which are incorporated by reference into the definition of INSURED PROJECT*, describe the entire structure: "New construction of the Transit Center Building . . . ." *Id.* at ZA_PF 000925

8

United States District Court
Northern District of California

not cite any authority for the proposition that the Valuation provision, contained in the "Policy Conditions" section of the Policy, limits the broad coverage of the insuring agreement to only cover "repairs" to "damaged property" as so narrowly defined by Zurich.  "As a general rule, conditions neither confer nor exclude coverage for a particular risk but, rather, impose certain duties on the insured in order to obtain the coverage provided by the policy."  *North American Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 177 Cal. App. 4th 272, 289-90 (2009).  Further, at least one court has rejected a similar attempt by Zurich to rely on a Valuation provision to limit coverage in an "all risk" policy to cover only repair costs to a damaged portion of a construction project:

> [A]s Aztar points out, the Policy does not restrict coverage only to the area of the Project where the accident occurred.  To the contrary, the Policy insures physical damage to the insured property at the "Insured Project."  The Policy defines the "Property Insured" to include all property used to construct the "Insured Project" and "Insured Project" as "the work which the Insured is contractually obligated to perform in accordance with the contract documents."  The "work" referenced in this definition is defined as the "construction of a 27 Story—350′ High Multi-[U]se Non–Combustible Building." (Aztar's Statement of Material Facts ¶¶ 10–12.)

> Zurich's argument that the Policy's Valuation Clause limits coverage to only repair costs, and not increased costs to complete construction of undamaged property, are unpersuasive.  The Policy's Valuation Clause states that the Policy covers only costs to "repair or replace the property lost or damaged at the time and place of loss with materials of like kind and quality less betterment...." However, the Court finds that from the perspective of an ordinary insured reading the Policy—the perspective from which this Court must view the language of the Policy, *see Daus v. Marble*, 270 N.J.Super. 241, 251, 636 A.2d 1091 (App.Div.1994)—the term "property lost or damaged" as a result of the collapse refers to the entire structure, not simply to the location of the collapse.

*Zurich Am. Ins. Co. v. Keating Bldg. Corp.*, 513 F. Supp. 2d 55, 69 (D.N.J. 2007).  Further, there are numerous factual disputes about what "repairs" were needed to repair the "damaged property." Accordingly, the Court DENIES Zurich's motion for summary judgment on this ground.

### III.    Liquidated Damages

Webcor's claimed damages include $17 million in liquidated damages TJPA has asserted against Webcor under their construction contract.  Zurich contends that these damages are barred by the Policy's Exclusion No. 4.A. for Consequential Loss:

### 4. __EXCLUSIONS__

This Policy does not insure against loss, damage or expense caused by, resulting from, contributed to or made worse by any of the following, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical loss or damage insured by this Policy, except as specifically allowed below:

A. Consequential loss, damage or expense of any kind or description including:

(1) loss of market or delay;

(2) delay in completion;

(3) liquidated damages or performance penalties;

(4) penalties for non-completion; or

(5) non compliance with contract conditions;

Whether caused by a peril insured or otherwise; however the foregoing shall not exclude Delay In Completion Coverage when it is endorsed to this Policy;

. . .

Briggs Decl., Ex. U at ZA_PF000930.

Webcor's opposition contends that Zurich is precluded from relying on Exclusion 4.A because Zurich did not invoke that exclusion in its responses to Webcor's interrogatories 10 and 11, which asked Zurich to identify any exclusions upon which it intended to rely to deny coverage for Webcor's damages. Those interrogatories asked Zurich to "[s]tate the basis for your contention, if you so contend, that any exclusion (other than or in addition to the COST OF MAKING GOOD EXCLUSION) eliminates coverage for the damages claimed by WOJV with respect to the CLAIM" and the basis for any contention that "any term(s) or condition(s) of the POLICY eliminate(s) coverage for the damages claimed by WOJV with respect to the claim." *See* Briggs Decl., Ex H at Nos. 10-11; Ex. I at No. 11. Zurich's March and June 2021 interrogatory responses did not disclose any reliance on the Consequential Loss exclusion. *Id.*

Instead, after Webcor filed its opposition to the current summary judgment motion, Zurich amended its responses to Interrogatories 10 and 11 on January 28, 2022, to state for the first time that the Consequential Loss exclusion barred Webcor's claim for liquidated damages. *See* Hecimovich Decl., Ex. O (Dkt. No. 154-3). Zurich's reply asserts that it did not learn of Webcor's claim for liquidated damages until November 29, 2021, when Webcor amended its interrogatory

10

responses and attached the expert declaration of Elaine White regarding damages, and thus that it is not precluded from asserting that exclusion now.  Zurich's reply did not explain why, if counsel learned about Webcor's liquidated damages claim on November 29, 2021, counsel nevertheless waited until January 28, 2022 to amend Zurich's interrogatory responses.

Prior to the summary judgment hearing, the Court ordered Webcor to file a supplemental brief showing when it disclosed its claim for liquidated damages to Zurich, and directed Zurich's counsel to be prepared to explain why Zurich did not amend its interrogatory responses until January 28, 2022. *See* Dkt. No. 160.  Webcor's supplemental brief (Dkt. No. 168) demonstrates that Zurich was on notice of Webcor's claim no later than August 6, 2021, when Webcor produced a damages spreadsheet listing almost $17 million dollars in "TJPA Direct Damages" with separate line items for two types of daily penalties under the TJPA-Webcor contract.  Briggs Supp. Decl. Ex. E at WOJV-BR-1240327 (Dkt. No. 168-1).  Indeed, Zurich's counsel took a Rule 30(b)(6) deposition of Webcor's witness regarding damages on August 16, 2021, and specifically questioned the witness about Webcor's claim for liquidated damages.  *Id*. Ex. F (Delgado Dep. at 38, 155-160) (Dkt. No. 168-1).  Further, Webcor has submitted documents showing that it disclosed its liquidated damages on October 30, 2020, in a damages spreadsheet; that spreadsheet listed almost $17 million in "TJPA Preliminary Damages."  *Id*. Ex. D.  Regardless of whether the October 30, 2020, spreadsheet clearly identified Webcor's claim for liquidated damages, Zurich has indisputably been aware of Webcor's liquidated damages claim since August 2021.[8]  Further, the record shows that Zurich's own damages experts opined on Webcor's liquidated damages claim as early as November 1, 2021.  *See id*. at Ex. G (Twomey Report); Ex. H (Rosenthal Report).

At the hearing, Zurich's counsel stated that he did not amend Zurich's interrogatory responses until January 28, 2022, because this case was being actively litigated during the fall of 2021 and he was too busy.

Webcor also argues that, under the circumstances here, the exclusion is not clear and

---

[8]  Webcor's August 26, 2021 supplemental interrogatory responses regarding its losses identified both the October 30, 2020 and the August 6, 2021 damages spreadsheets by Bates numbers.  *See* Dkt. No. 138-11 at 16.

United States District Court
Northern District of California

1  unambiguous because it is not obvious that "consequential loss" or "consequential damages" would

2  include the TJPA liquidated damages.  Webcor argues that because the TJPA-Webcor contract

3  defines "liquidated damages" as "direct damages," *see* Briggs Decl., Ex. C at §§ 4.02 and 9.04, and

4  because "consequential damages" are indirect damages, Webcor would have no reason to know that

5  any liquidated damages under the TJPA contract would not be covered by the Zurich policy.

6  Webcor also asserts that its reasonable expectations of coverage are reinforced by the fact that TJPA

7  and WOJV waived all "consequential" damages against each other.  *Id.* at § 9.04.

8       Federal Rule of Civil Procedure 37(c)(1) provides that a party's failure to disclose or

9  supplement information will result in that party being precluded from using that information on a

10  motion, at a hearing, or at trial, unless that failure was substantially justified or harmless.  This

11  sanction applies to failures to supplement discovery responses in accordance with Federal Rule of

12  Civil Procedure 26(e).  *See id.*; *see also Hoffman v. Constr. Prot. Servs., Inc.*, 541 F.3d 1175, 1179

13  (9th Cir. 2008) (affirming district court's order excluding undisclosed damages evidence); *Yeti by*

14  *Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("[A]lthough we review

15  every discovery sanction for an abuse of discretion, we give particularly wide latitude to the district

16  court's discretion to issue sanctions under Rule 37(c)(1). . . . This particular subsection, implemented

17  in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power. . . .  The

18  Advisory Committee Notes describe it as a 'self-executing,' 'automatic' sanction to 'provide[ ] a

19  strong inducement for disclosure of material. . . .' Fed. R. Civ. P. 37 advisory committee's note

20  (1993).").

21       The Court concludes that Zurich has not shown that its late disclosure of its intent to rely on

22  the Consequential Loss exclusion was either substantially justified or harmless.  Even accepting

23  Zurich's assertion that it did not know of Webcor's liquidated damages claim until November 29,

24  2021 – an assertion belied by the record in this case – Zurich still waited two months to amend its

25  interrogatory responses, with the only justification being that Zurich's counsel was "too busy."  The

26  late disclosure was not harmless, as fact discovery closed on December 17, 2021, and Webcor's

27  opposition identifies specific discovery it would have taken had it known that Zurich would assert

28  that the Consequential Loss exclusion barred its claim for liquidated damages.  Under these

circumstances, the Court concludes that pursuant to Rule 37(c)(1), Zurich may not now assert the Consequential Loss exclusion.

## IV.     Bad Faith/Punitive Damages

Zurich contends that under the "genuine dispute" doctrine, it is entitled to summary judgment on Webcor's claims for bad faith regarding the denial of its claim.  *See Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001), as modified on denial of reh'g (July 30, 2001) ("[W]here there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute.").  Zurich argues that there is a genuine dispute about whether there was coverage for Webcor's insurance claim under both the manifestation of loss doctrine and the Cost of Making Good Exclusion, and thus that there can be no liability for bad faith or punitive damages.  As support for its position regarding the manifestation of loss doctrine, Zurich has submitted the report of its expert, James Wraith, who opines about "the reasonableness of Zurich American property adjuster's (Cynthia Franklin) claims analysis and claims adjuster's understanding of California first-property insurance trigger of coverage doctrine ("manifestation") for the . . . insurance claim." Hecimovich Decl. Ex. M (Dkt. No. 138-14).  Zurich advances similar arguments for why it is entitled to summary judgment on Webcor's request for punitive damages.

Webcor opposes Zurich's arguments on numerous grounds, including raising the evidentiary objection that expert reports are inadmissible hearsay.  Generally, expert reports are inadmissible hearsay.  *See Hunt v. City of Portland*, 599 F. App'x 620, 621 (9th Cir. 2013) (holding written expert report was inadmissible hearsay); *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984) (explaining that Federal Rule of Evidence 703 "does not allow the admission of [expert] reports to establish the truth of what they assert").  However, "a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony," *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

Here, Zurich's reply does not address Webcor's correct evidentiary objection to Mr. Wraith's report, nor does Zurich state whether Mr. Wraith would testify at trial.  As such, the Court does not consider Mr. Wraith's report in connection with this motion.

Webcor contends, *inter alia*, that Zurich's investigation of Webcor's claim was inadequate and biased and that Zurich retained coverage counsel to manufacture a basis for a denial.  Webcor argues that evidence of Zurich's bad faith includes that Zurich failed to initiate any investigation for nearly two months after receiving notice of the Fremont Street fractures and then closed the claim on November 19, 2018; Zurich reopened the claim at the request of Webcor on November 29, 2018; although Webcor's notice of loss stated that the damage likely occurred during active construction during the policy term, Zurich's adjuster Ms. Franklin determined within hours of receiving the claim file that "it does not appear that there will be coverage"; Zurich's internal documents suggested that the fractures occurred within the policy period; Zurich had never before invoked the "manifestation doctrine" to deny coverage under a builder's risk policy; and Zurich has asserted multiple different theories of causation and interpretations of the Cost of Making Good Exclusion.

"[A]n insurer's bad faith is ordinarily a question of fact to be determined by a jury by considering the evidence of motive, intent and state of mind."  *Chateau Chamberay*, 90 Cal. App. 4th at 350.  "An insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably."  *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 724 (2007).  Evidence of a biased investigation "may preclude a finding that the insurer was engaged in a genuine dispute, even if the insurer advances expert opinions concerning its conduct."  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1010 (9th Cir. 2004) (citing *Chateau Chamberay*, 108 Cal.Rptr.2d at 785 ("an [insurer] expert's testimony [demonstrating a genuine dispute as to liability] will not automatically insulate an insurer from a bad faith claim based on a biased investigation")).

The Court concludes that Webcor has raised triable issues of fact as to the reasonableness of Zurich's claims handling, including whether Zurich's investigation of its claim was biased, and thus summary judgment on the bad faith claim is not warranted.  The Court is also not persuaded by Zurich's arguments that it cannot be liable for bad faith because there is a genuine dispute over

specific repair costs, or costs for which it claims Webcor did not provide sufficient documentation, because Zurich never denied Webcor's claim on those grounds.  Zurich denied Webcor's claim based on the manifestation of loss doctrine and the Cost of Making Good Exclusion.  *See* Dkt. No. 12-1 at 60, 67-68.  Finally, the Court finds that viewing the evidence in the light most favorable to Webcor, there are triable issues of fact as to whether Zurich could be liable for punitive damages.

## CONCLUSION

For the foregoing reasons, the Court DENIES Zurich's motion for summary judgment.


**IT IS SO ORDERED**.

Dated: February 15, 2022                              _____
                                                                            SUSAN ILLSTON
                                                                            United States District Judge